UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
ADVANCED WATER TECHNOLOGIES INC.,   Case No. :1:18-cv-05473-VSB

                Plaintiff,   **DECLARATION OF**
                                                                     **MATTHIAS KRIESBERG**
  -against-   **IN OPPOSITION TO MOTION**
                                                                       **TO DISMISS**

AMIAD U.S.A., INC.,

                Defendant.
-----------------------------------------------------------------x

       I, Matthias Kriesberg, pursuant to 28 U.S.C. § 1746, declare under the penalty of perjury and under the laws of the United States of America that the following is true and correct:

       1.     I am the President of the plaintiff Advanced Water Technologies, Inc. ("AWT"), have personal knowledge of the facts set forth herein, and submit this declaration in opposition to the motion by defendant Amiad U.S.A., Inc ("Amiad") for an order dismissing the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP"), or alternatively, dismissing this action under the "first-filed" rule. A copy of AWT's complaint is annexed hereto as Exhibit "A."

       2.     I am advised by my attorney that Amiad seeks dismissal of the Complaint based, in part, on defendant's argument that AWT cannot succeed on its breach of contract claim because (1) defendant properly terminated the Contract, and (2) AWT breached the Contract by not timely paying defendant's invoices. I am also advised that these arguments are inappropriate and of no legal significance on a pre-answer motion to dismiss. However, in the event that the court deems it relevant, I submit the following facts.

3. AWT is in the business of distributing, installing and servicing domestic water filtration systems and products. On March 31, 2005, AWT and Amiad entered into a contract (the "Contract") whereby Amiad assigned the distribution of its screen filtration products exclusively to AWT for wholesale and retail sales within the five boroughs of New York City, as well as Nassau and Suffolk counties.  A copy of the Contract is annexed to AWT's complaint as Exhibit A.

4. The parties agreed that renewal of the Contract would be automatic on an annual basis if AWT purchased an agreed dollar volume from Amiad during the previous year (the "Sales Quota").  The automatic renewal of the Contract was also subject to AWT's continued creditworthiness, continuing and responsible efforts to sell Amiad filtration, and responsible maintenance of the equipment it has sold.

5. The Sales Quota for net purchases by AWT of Amiad products for the initial fiscal year, defined as January 1 – December 2005, was agreed to be $55,000.

6. The Contract provides that any annual increase in the Sales Quota "should be a reasonable number and will be jointly agreed between Amiad and AWT."

7. Amiad and AWT never jointly agreed to <u>increase</u> the $55,000 annual Sales Quota.

8. Defendant attempts to deceive or mislead the Court by stating that AWT admitted that the parties never agreed to a Sales Quota past 2005.  To the contrary, AWT has maintained that although the parties never agreed to <u>an increase</u> to the Sales Quota, the parties did agree to the Sales Quota for each and every year from 2005 through 2018, the year that defendant improperly terminated the Contract.

9.      The parties agreed, as stated in the Contract, that the Sales Quota would be $55,000, which was only <u>subject to increase if the parties jointly agreed</u>.  Because the parties never jointly agreed to an increase in the Sales Quota, the Sales Quota remained $55,000 per year.

10.     Defendant inexplicably states, "While the Agreement was not subject to automatic renewal, AWT continued to purchase Amiad's products . . . ."  Miles Declaration at ¶ 5.  However, defendant does not specify the time period that it alleges the Contract was not subject to automatic renewal.  As per the unambiguous terms of the Contract, the Contract was always subject to automatic renewal.

11.     Moreover, contrary to the position taken by defendant, the Contract was not an "agreement to agree" and was never treated that way.  There is no missing information in the Contract that renders it vague and unenforceable – the Sales Quota formula is clearly defined.  From 2005 until 2016, both AWT and defendant understood, agreed and worked under the premise that the $55,000 Sales Quota would continue to be the Sales Quota for the following year unless and until both parties agreed on an increase to that number.

12.     Indeed, for eleven (11) years the Sales Quota was not an issue; Amiad did not claim that the terms of the Sales Quota were any different than what I have described above.  As explained in more detail below, in 2016 and then again in 2017, Amiad attempted to change the terms of the Contract – a change that would allow it to <u>unilaterally</u> increase the Sales Quota.

13.     From 2005 through April 2018, AWT purchased products from Amiad for AWT's customers in the agreed upon territory of the five boroughs of New York City and Nassau and Suffolk counties totaling approximately Four Million Dollars ($4,000,000).  During that time period, AWT never failed to meet the $55,000 annual Sales Quota.

14. For the fiscal year January 1 - December 31, 2017, AWT's sales totaled approximately $207,000, and thus met the annual Sales Quota in place of $55,000.

15. As of April 13, 2018, AWT had met the required annual Sales Quota and fulfilled all of its obligations and responsibilities under the Contract for each and every year from 2005 through April 13, 2018.

16. Notwithstanding, by letter dated April 13, 2018, Amiad provided notice to AWT that Amiad hereby "<u>immediately terminates</u>" the Contract based upon AWT's alleged breach of the Contract by its failure to pay an overdue balance of $18,085.27.

17. AWT promptly rejected Amiad's purported termination by letter dated May 1, 2018. Additionally, along with AWT's rejection of Amiad's termination of the Contract, AWT remitted payment to Amiad in the amount of $17,399.63, representing what AWT believed to be the outstanding balance owed to Amiad at that time.

18. Amiad refused to cash AWT's check, maintaining that the balance owed to it is $18,085.27 (a mere difference of $685.64), and that it properly terminated the Contract. AWT attempted to reconcile the outstanding balance with Amiad and continue working under the Contract, but Amiad refused to honor the Contract.

19. Although defendant purportedly based its April 13, 2018 termination of the Contract on AWT's alleged nonpayment of invoices, the real reason for defendant's termination of the Contract is that it no longer wanted to do business with AWT pursuant to the Contract; the stated reason of nonpayment of invoices was and still is a pretext.

20. Indeed, defendant tried unsuccessfully at least four times before to unilaterally increase the Sales Quota in order to create a basis to terminate the Contract. By letter dated June

4

28, 2016, defendant attempted to unilaterally and retroactively increase the Sales Quota for 2016 from $55,000 to $431,919 -- a staggering 785% increase.  A copy of defendant's June 28, 2016 letter is annexed hereto as Exhibit "B."   In this letter, defendant threatens to terminate exclusivity granted to AWT because AWT was "far from reaching its sales target [of $431,919], and complying to [sic] the obligations in the Agreement."

21.     In addition, defendant stated that AWT was "in breach of the spirit of the agreement and the relationship between the parties" because AWT was "presenting competing products to Amiad's products."  Defendant had no basis to terminate exclusivity on these grounds as the Contract did not preclude AWT from selling products other than Amiad's, and AWT never agreed to sell only Amiad's products to its customers.

22.     By letter dated August 1, 2016, AWT responded to Aniad and reminded it that Amiad's unilateral increase of the Sales Quota to $431,919 "is not accurate, as the controlling agreement of March 31, 2005 . . . states an annual quota of $55,000 per year . . . [and t]he annual 55K quota remains in place unless changed by agreement of both parties."   A copy of AWT's August 1, 2016 letter is attached hereto as Exhibit "C."   <u>Amiad did not respond</u>.

23.     Approximately a year later, by letter dated March 14, 2017, defendant again attempted to terminate the Contract because of AWT's alleged failure "with respect to setting and complying with annual sales target [amount unspecified], as well as lack of compliance to payment terms."   A copy of defendant's March 14, 2017 letter is annexed hereto as Exhibit "D."

24.      By letter dated March 29, 2017, AWT again rejected defendant's termination and reminded defendant that pursuant to the explicit terms of the Contract, the Contract was automatically renewed at least through 2018 because AWT had met the Sales Quota for 2016 and

5

2017.  A copy of AWT's March 29, 2017 letter is annexed hereto as Exhibit "E."  <u>Amiad did not respond.</u>

25.     Eight months later, on November 27, 2017, Michael Poth, Amiad's President, Eric Peterson, Amiad's Vice-President, and Eyal Yavin, Amiad's regional sales manager for the New York territory, came to New York City to meet me to discuss increasing sales volume.  At that meeting, I reminded Amiad of severe quality control issues with Amiad's products that were inhibiting market growth.

26.     In response, Amiad's President committed to send personnel to NYC to investigate these matters in the field.  <u>Amiad never followed up on that promise</u>.

27.     On Sunday evening, December 31, 2017, Mr. Poth sent an email to me stating he was unilaterally setting a "target" for 2018 of $700,000 in annual purchase volume.  I replied by email on January 5, 2018 reminding him of the terms of the Contract as referenced above.  I also expressed my willingness to negotiate a new sales quota to be effective for 2019.  <u>Amiad did not respond.</u>

28.     Apparently realizing that it could not unilaterally increase the Sales Quota and then terminate the Contract based upon AWT's failure to meet that new Sales Quota, defendant changed its tactics and based its most recent termination of the Contract on AWT's alleged failure to timely pay defendant's invoices.

29.     However, defendant's latest attempt to terminate the Contract must also fail because the Contract does not contain any payment terms.  Clearly, AWT cannot be in breach of making timely payments when there is no requirement in the Contract that AWT remit payment by a date certain.

30. Defendant argues that the invoices together with the Contract formed the "contractual relationship" of the parties. However, the terms contained in the invoices were never negotiated between the parties and were unilaterally created by Amiad. The invoices and their terms were also never agreed to nor complied with by AWT for the entire thirteen year relationship between AWT and defendant. In addition, until 2017, defendant never attempted to enforce the terms of its invoices. Now, these invoices which were never agreed to, complied with, or enforced in thirteen years serve as defendant's basis for its termination of the Contract.

31. Since 2005, defendant has held balances due for products purchased by AWT in much larger amounts and for much longer periods of time than the $18,085.27 balance Amiad alleges is owed. Indeed, on average, AWT's running monthly balance was approximately $100,000, and was as high as $267,000. The $18,000 balance in April 2018 was near the lowest balance amount in three years. AWT's payments to Amiad in 2018 and balances carried were consistent with the parties' course of dealing over the past 13 years and consistent with the norms in the construction industry. There was usually a lag time of 30-90 days for AWT to be paid from the customers of defendant's products. Because defendant recognized and understood the payment lag time from the end-use customers it allowed AWT to carry the aforementioned balances.

32. Additional evidence that defendant's termination of the Contract based upon AWT's failure to make timely payments is a ploy is that <u>AWT attempted to remit the balance due on May 1, 2018, but defendant rejected the payment claiming that it was $685.64 less than the amount that was actually due</u>. Of course any discrepancies in the correct balance amount could have been worked out between the parties, but defendant was only interested in getting out from a Contract it no longer wanted.

Case 1:18-cv-05473-VSB   Document 20   Filed 11/05/18   Page 8 of 8

33. For the foregoing reasons, I respectfully request that the court deny defendant's motion to dismiss the complaint.

I DECLARE UNDER THE PENALTY OF PURJURY THAT THE FOREGOING IS TRUE AND CORRECT.  EXECUTED ON NOVEMBER 5, 2018.

By: _____
Matthias Kriesberg