```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
ADVANCED WATER TECHNOLOGIES                                 :
INC.,                                                       :
                                                            :
                                    Plaintiff,              :     18-CV-5473 (VSB)
                                                            :
                  - against -                               :     **OPINION & ORDER**
                                                            :
AMIAD U.S.A., INC.,                                         :
                                                            :
                                    Defendant.              :
                                                            :
------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/30/2019

Appearances:

Ronald Francis
Ronald Francis Esq.
New York, New York
*Counsel for Plaintiff*

Courtney Janae Peterson
Noah Weissman
Bryan Cave Leighton Paisner LLP
New York, New York
*Counsel for Defendant*

VERNON S. BRODERICK, United States District Judge:

  Plaintiff Advanced Water Technologies Inc. ("AWT") brings this breach of contract action against Amiad U.S.A., Inc. ("Amiad"), arising out of Amiad's termination of a 2005 contract between the parties designating AWT as the exclusive distributor of Amiad's water filtration products in New York City and the surrounding area. Before me is Amiad's motion to dismiss AWT's complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). Because I find the language of the parties' agreement to be ambiguous, I cannot conclude as a matter of law that Amiad was permitted to terminate the contract under the circumstances presented here. Amiad's motion to dismiss is therefore DENIED.

I.  **Background**[1]

Plaintiff AWT is a New York corporation that distributes, installs, and services domestic water filtration systems and products. (Compl. ¶¶ 1, 7.) Defendant Amiad, a California corporation with a principal place of business in North Carolina, manufactures water filtration products. (*Id.* ¶¶ 2, 9.) On March 31, 2005, AWT and Amiad entered into a one-page contract (the "Agreement," *id.* Ex. A), pursuant to which AWT was designated as the exclusive distributor for wholesale and retail sales of Amiad's screen filtration products in New York City, as well as Nassau and Suffolk Counties. (*Id.* ¶ 10.) The Agreement required AWT to "purchase an agreed $ volume from Amiad on an annual basis." (*Id.* Ex. A.) If AWT did so, "it ha[d] an automatic right of renewal" of the Agreement. (*Id.*) The Agreement further provided that the sales quota for net purchases of Amiad products for 2005 would be $55,000, and stated that "[t]he annual increase in sales/quota should be a reasonable number and will be jointly agreed between Amiad and AWT." (*Id.*)

From 2005 through April 2018, AWT purchased water filtration products from Amiad for AWT's customers in the New York City area. (*Id.* ¶ 16.) AWT's total purchases from Amiad during this time period totaled approximately $4,000,000. (*Id.*) The parties never agreed to modify the $55,000 annual sales quota set forth in their 2005 Agreement, and between 2005 and 2018, AWT's annual sales always exceeded $55,000. (*Id.* ¶¶ 15–16.) In 2017, AWT sold approximately $207,000 in Amiad products to New York customers. (*Id.* ¶ 17.)

On April 13, 2018, Amiad provided notice by letter to AWT that the parties' Agreement was "immediately terminate[d]" based on AWT's failure to pay an overdue balance of

---

[1] The following factual summary is drawn from the allegations of the Complaint ("Compl.," Doc. 1), filed on June 18, 2018, unless otherwise indicated, which I assume to be true for purposes of this motion. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). My references to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

2

$18,085.27. (*Id.* ¶ 19.) On May 1, 2018, AWT rejected Amiad's purported termination and remitted payment to Amiad in the amount of $17,399.63, representing the total amount AWT believed to be owed to Amiad at the time. (*Id.* ¶ 21.) Amiad refused to cash AWT's check and rejected AWT's subsequent attempts to reconcile its outstanding balance. (*Id.* ¶¶ 22–23.)

## II. Procedural History

On May 17, 2018, Amiad filed a breach of contract action against AWT in North Carolina's Guilford County Superior Court (the "North Carolina action"), seeking damages for unpaid invoices. *See Amiad U.S.A, Inc. v. Advanced Water Techs., Inc.*, No. 1:18CV520, 2019 WL 1359240, at *1 (M.D.N.C. Mar. 26, 2019). On June 19, 2018, AWT removed the North Carolina action to the United States District Court for the Middle District of North Carolina. *Id.*

AWT filed its Complaint in this Court on June 18, 2018, alleging that Amiad—not AWT—had breached the Agreement by terminating the contract despite AWT having satisfied all of its obligations under the Agreement, thereby triggering AWT's automatic right of renewal for 2018. (*See* Compl. ¶¶ 24–28.) On September 28, 2018, Amiad filed its motion to dismiss the Complaint, (Doc. 12), along with a memorandum of law, (Doc. 15), and supporting declarations with exhibits, (Docs. 13, 14). Amiad asserts that AWT fails to state a claim upon which relief may be granted and argues, in the alternative, that the Complaint should be dismissed in favor of the North Carolina action, pursuant to the "first-filed" rule. (*See generally* Doc. 15.) On November 5, 2018, AWT filed its opposition to Amiad's motion, (Doc. 19), also accompanied by a supporting declaration with exhibits, (Doc. 20). Amiad filed its reply on November 26, 2018, (Doc. 23). On April 3, 2019, AWT filed a notice of supplemental authority indicating that the North Carolina action had been dismissed for lack of personal jurisdiction over AWT. (Doc. 24.)

3

### III. Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Finally, although allegations contained in a complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (citation omitted). Where a document is not incorporated by reference, "the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document 'integral' to the complaint." *Id.* at 153 (internal

quotation marks omitted). Finally, a court may consider any matters that are subject to judicial notice, including publicly filed documents. *Cortec Indus., Inc. v. Sum Holdings L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).[2]

## IV. Discussion

### A. *Breach of Contract*

Amiad argues that AWT fails to state a breach of contract claim because (1) in the absence of a 2017 sales quota, Amiad was permitted discontinue AWT's exclusive distribution right for 2018; and (2) AWT materially breached the Agreement by failing to timely pay Amiad's invoices, thereby permitting Amiad to terminate the contract. Neither argument entitles Amiad to dismissal at this early stage of the litigation.

#### 1. Applicable Law

Under New York law,[3] a plaintiff claiming a breach of contract must allege: "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Orchard Hill Master Fund Ltd. v. SBA Commc'ns*

---

[2] The parties dispute whether certain documents—including Amiad's invoices and various declarations—are integral to the Complaint or are otherwise appropriately subject to judicial notice. (*See* Amiad Br. 8 n.2, 11 n.3; AWT Opp'n 8–11; Amiad Reply 6–7.) ("Amiad Br." refers to Defendant's Memorandum of Law in Support of Its Motion to Dismiss the Complaint, filed September 28, 2018, (Doc. 15). "AWT Opp'n" refers to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss the Complaint, filed November 5, 2018, (Doc. 19). "Amiad Reply" refers to Defendant's Reply Memorandum of Law in Support of Its Motion to Dismiss the Complaint, filed November 26, 2018, (Doc. 23).) Because these documents do not affect the outcome of my decision, I decline to consider them.

[3] The parties' Agreement does not contain a choice-of-law clause but I find that New York law governs. As jurisdiction in this matter is based on diversity of citizenship, I am bound to apply New York choice-of-law rules. *See, e.g.*, *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001) ("A federal trial court sitting in diversity jurisdiction must apply the law of the forum state to determine the choice-of-law." (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941))). "In the absence of a choice of law provision, New York courts apply the law of the forum in which the 'center of gravity' . . . is located." *Herald Square Loft Corp. v. Merrimack Mut. Fire Ins. Co.*, 344 F. Supp. 2d 915, 918 n.2 (S.D.N.Y. 2004) (quoting *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir. 1997)). I conclude that New York is the "center of gravity" of this contract—which was intended to be performed in New York by a New York corporation—and that the Agreement is therefore governed by New York law. I also note that neither party argues for the application of another state's law and that Amiad appears to agree that New York law applies. (*See* Amiad Br. 7, 11 (setting forth various rules under "New York law").)

*Corp.*, 830 F.3d 152, 156 (2d Cir. 2016) (citation omitted). A court's primary objective in interpreting a contract "is to give effect to the intent of the parties as revealed by the language of their agreement." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000); *see also Greenwich Capital Fin. Prods., Inc. v. Negrin*, 903 N.Y.S.2d 346, 348 (1st Dep't 2010) (courts are bound to construe the terms of a contract "in a manner that accords the words their fair and reasonable meaning, and achieves a practical interpretation of the expressions of the parties" (internal quotation marks omitted)).

A district court may dismiss a breach of contract claim at the motion-to-dismiss stage only where "the terms of the contract are unambiguous." *Orchard Hill*, 830 F.3d at 156. A contract is ambiguous "if its terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 114 (2d Cir. 2014) (internal quotation marks omitted). There is no ambiguity "where the contract language has a definite and precise meaning." *Id.*

### 2. Application

The parties' Agreement provides, in pertinent part:

> AWT must purchase an agreed $ volume from Amiad on an annual basis; if AWT does not do so, Amiad may elect to continue or discontinue the exclusive nature of the distribution agreement. The annual increase in sales/quota should be a reasonable number and will be jointly agreed between Amiad and AWT. If AWT meets the quota, it has an automatic right of renewal, subject to continued creditworthiness, continuing and responsible efforts to sell Amiad filtration, and responsible maintenance of equipment it has sold. The sales quota/target for NET purchases of Amiad products is US $55,000 in FY 2005 (i.e. January 1 – December 31, 2005).

(Compl. Ex. A.) Given that the parties never subsequently raised the annual sales quota set forth in the Agreement, (*see id.* ¶ 15), AWT reads this language to provide AWT an automatic right of renewal for 2018 so long as AWT met the $55,000 quota in 2017. Accordingly, because AWT far exceeded $55,000 in sales in 2017, the Agreement was automatically renewed for 2018 and Amiad breached the Agreement by terminating it mid-year. Amiad responds that there was no quota in place for 2017 because the parties did not "jointly agree[]" to an "annual increase" for that year. As a result, a necessary precondition to AWT's automatic right of renewal—i.e., fulfilling an "increase[d] sales/quota" for 2017—was not satisfied because there was no applicable sales quota in place. Amiad was therefore free to "continue or discontinue the exclusive nature of the distribution agreement" at will.

I find both of these readings to be plausible. Although the Agreement allows for the applicable sales quota to be increased annually, there is no indication in the contract that if the parties fail to adjust the quota each year, there will cease to be any sales quota at all. I decline to effectively read such a provision into the Agreement at the motion-to-dismiss stage, particularly given that the Agreement expressly includes an "agreed $ volume" (i.e., $55,000) that might reasonably continue to govern unless and until the parties agree to modify it. *Cf. May Metro. Corp. v. May Oil Burner Corp.*, 290 N.Y. 260, 265 (1943) (declining to find that contract providing for automatic renewal if plaintiff satisfied a "mutually agreed upon" quota terminated where parties did not reach agreement as to the following year's quota, in part because contract did not contain "any statement that, absent such agreement, the long-existing relationship [between the parties] shall forthwith be dissolved").

On the other hand, the Agreement also fails to expressly indicate that if the parties do not adjust the sales quota each year, the previously agreed upon quota shall remain in effect. The

Agreement should not be read to permit AWT to bind Amiad to the parties' exclusive distribution arrangement in perpetuity simply by meeting the 2005 quota year after year, and rejecting any attempt by Amiad to raise that quota. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Monarch Payroll, Inc.*, No. 15-cv-3642 (PKC), 2016 WL 634083, at *10 (S.D.N.Y. Feb. 17, 2016) ("[A] contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." (citation omitted)). That said, the Agreement contains language referencing a "reasonable" annual increase, (Compl. Ex. A), on which Amiad might rely if AWT arbitrarily rejected reasonable, good faith attempts by Amiad to raise the quota. AWT is also bound by an implied duty of good faith and fair dealing, which would preclude it from engaging in such abusive conduct. *See 19 Recordings Ltd. v. Sony Music Entm't*, 165 F. Supp. 3d 156, 161 (S.D.N.Y. 2016) ("Under New York law, 'a covenant of good faith and fair dealing in the course of contract performance' is '[i]mplicit in all contracts.'" (alternation in original) (quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995))). Moreover, even if Amiad is correct that AWT did not have an automatic right to renew the contract for 2018 because there was no 2017 quota in place for AWT to satisfy, it does not necessarily follow that Amiad was free to terminate the Agreement in April 2018, effective immediately. The Agreement—which is renewed "on an annual basis," (Compl. Ex. A)—certainly permits Amiad to decline to renew the contract for the following year where AWT has not satisfied an agreed-upon quota; however, it is not clear that Amiad may terminate the Agreement mid-year.[4]

---

[4] Amiad also contends that the Agreement is an unenforceable "agreement to agree, in which a material term"—here, updated sales quotas for the years following 2005—"is left for future negotiations." (Amiad Br. 9 (quoting *Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109–10 (1981)).) However, the primary case upon which Amiad relies—which held that a five-year commercial lease that provided for renewal "for an additional period of five years at annual rentals to be agreed upon" was unenforceable for uncertainty—expressly distinguished

8

Because I find that the relevant terms of the parties' Agreement "could suggest more than one meaning when viewed objectively by a reasonably intelligent person," *Chesapeake Energy Corp.*, 773 F.3d at 114, I cannot conclude that AWT has failed to state a breach of contract claim.

Amiad argues further that it was entitled to terminate the Agreement because AWT failed to timely pay certain invoices. (*See* Amiad Br. 11–12.) AWT concedes in its Complaint that Amiad purported to justify its termination of the parties' Agreement on the basis that AWT had failed "to pay an overdue balance of $18,085.27." (Compl. ¶ 19.) Shortly after receiving Amiad's termination notice, AWT remitted payment to Amiad in the amount of $17,399.63—the amount that "AWT believed to be the outstanding balance owed to Amiad at that time," and just $685.64 less than the amount Amiad claimed was due and owing. (*Id.* ¶ 21.) Amiad, however, refused to cash AWT's check. (*Id.* ¶ 22.) Instead, Amiad asserts that AWT's failure to timely pay its outstanding balance constitutes a material breach of the Agreement, which entitled Amiad to terminate the contract and sue for damages.

The Second Circuit has explained that a breach is deemed "material" only where it "go[es] to the root of the agreement between the parties." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016) (citation omitted). Whether a breach qualifies as "material" "turns on several factors, such as the absolute and relative magnitude of default, its effect on the contract's purpose, willfulness, and the degree to which the injured party has benefitted under the contract." *Id.* (citing *Hadden v. Consol. Edison Co. of N.Y.*, 34 N.Y.2d 88,

---

contracts made in the "more fluid sales setting" and noted that in the sales context, it made sense to provide a plaintiff "an opportunity to establish that a series of annual renewals had ripened into a course of dealing from which it might be possible to give meaning to an otherwise uncertain term." *Joseph Martin*, 52 N.Y.2d at 108, 111 (citing *May Metro. Corp.*, 290 N.Y. 260 (declining to find a contract for the sale of oil burners unenforceable where it provided that each year's sales quota was "to be mutually agreed upon")). Unlike *Joseph Martin*, the instant case involves a contract for the sale of goods (Amiad's water filtration systems), and I am therefore unpersuaded by Amiad's argument.

9

96 n.9 (1974)). For this reason, "[t]he determination whether a material breach has occurred is generally a question of fact." *Kuhbier v. McCartney, Verrino & Rosenberry Vested Producer Plan*, 239 F. Supp. 3d 710, 735 (S.D.N.Y. 2017) (quoting 23 Williston on Contracts § 63:3 (4th ed.)) (citing *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007)); *see also Katz v. Berisford Int'l PLC*, No. 96-cv-8695 (JGK), 2000 WL 959721, at *3 (S.D.N.Y. July 10, 2000) ("Materiality is a question of fact to be determined by the jury . . . .").

Although Amiad asserts broadly that AWT's failure to pay the relevant invoices is necessarily a material breach, (Amiad Br. 11), the case on which Amiad relies, *Jafari v. Wally Findlay Galleries*, was decided on summary judgment—after the court denied defendant's motion to dismiss. *See* 741 F. Supp. 64, 65, 67 (S.D.N.Y. 1990). In addition, in *Jafari*, unlike here, the amount and timing of the payment owed by plaintiff appear to have been express terms of the parties' agreement. *Id.* at 67.

It would be inappropriate for me to conclude as a matter of law at this stage of the case that AWT's outstanding $18,000 balance constituted a material breach that entitled Amiad to rescission. *See Callanan v. Powers*, 199 N.Y. 268 (1910) ("[Rescission] is not permitted for a slight, casual or technical breach, but, as a general rule, only for such as are material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract."). There are several outstanding questions that prevent me from reaching such a conclusion at the motion-to-dismiss stage, including (1) whether AWT's breach was significant in the context of the parties' nearly fifteen-year relationship and AWT's $4,000,000 in purchases from Amiad throughout that period, (*see* Compl. ¶ 16); (2) whether the payment terms that Amiad unilaterally imposed on AWT were reasonable given that the Agreement is silent as to the timing and manner of payments from AWT to Amiad; and (3) what

10

effect, if any, does AWT's prompt attempt to cure the breach have on Amiad's right to terminate the Agreement.[5]  *Cf. Process Am., Inc.*, 839 F.3d at 137 (concluding that defendant's failure to pay residuals was "not so significant as to constitute a material breach," in part because of defendant's "lengthy period of performance" prior to the breach).  Resolution of these questions requires discovery relating to the parties' long-term course of dealing.

### B. *First-Filed Rule*

Amiad argues, in the alternative, that "[i]f the Court declines to grant Amiad's motion to dismiss for failure to state a cause of action, it should dismiss the action under the first-filed rule." (Amiad Reply 7.)  The "first-filed rule" is a "well-settled" doctrine that provides that "where there are two competing lawsuits, the first suit should have priority, absent the showing of balance of convenience or special circumstances giving priority to the second." *First City Nat'l Bank & Tr. Co. v. Simmons*, 878 F.2d 76, 79 (2d Cir. 1989) (internal quotation marks omitted).

Here, Amiad filed a breach of contract action against AWT in North Carolina on May 17, 2018, *see Amiad*, 2019 WL 1359240, at *1—approximately one month before AWT filed the instant action.  While Amiad's motion to dismiss was pending before this Court, the U.S. District Court for the Middle District of North Carolina dismissed the North Carolina action on March 26, 2019 for lack of personal jurisdiction over AWT.  *Id.* at *6.  As a result of that dismissal, "there are no longer competing lawsuits" and the parties may "proceed with this case without the risk of duplicative litigation." *Reed v. 1-800-Flowers.com, Inc.*, 327 F. Supp. 3d 539, 545–46 (E.D.N.Y. 2018).  Amiad's first-filed argument is therefore denied as moot.  *See id.* at 545

---

[5] The above list of questions is not intended to be an exhaustive list.

(finding first-filed argument moot where first-filed lawsuit had been dismissed because "[w]hen the first-filed lawsuit is dismissed, it cannot take priority over the second-filed lawsuit").

## V. Conclusion

For the foregoing reasons, Amiad's motion to dismiss is DENIED. Amiad shall file an answer to the Complaint no later than twenty-one (21) days after the entry of this Opinion & Order.

The Clerk of Court is respectfully directed to terminate the motion pending at Docket Entry 12.

SO ORDERED.

Dated: September 30, 2019
      New York, New York

Vernon S. Broderick
United States District Judge