UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                               :

ADVANCED WATER TECHNOLOGIES, INC.,    :

                        Plaintiff,    :

                               :

         -v-                 :

                               :

AMIAD U.S.A., INC.                        :

                               :

                      Defendant.   :

                               :

------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/29/2020

18-cv-5473 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

      Defendant Amiad U.S.A., Inc. ("Amiad") moves to amend its answer and add a

counterclaim relating to alleged wrongdoing by Plaintiff Advanced Water Technologies, Inc.

("AWT"). For the following reasons, that motion is granted.

## BACKGROUND

      This action began on June 18, 2018 when AWT filed a Complaint against Amiad. (Dkt.

No. 1.) AWT and Amiad are both in the water filtration business. (*Id.* ¶¶ 7, 9.) Amiad

manufactures water filtration products while AWT distributes, installs, and services them. (*Id.*)

In 2005, AWT and Amiad entered into a one-page letter agreement (the "Contract"). (Dkt. No.

1–1.) The first paragraph of the Contract designated AWT as the exclusive distributor of

Amiad's water filtration products in New York City and the surrounding area but did not impose

any corresponding obligations on AWT. (*Id.*) The second paragraph of the Contract provided

the conditions on which the renewal of the Contract would be automatic:

      2) Renewal of this agreement will be automatic on an annual basis subject to the
      following:

      AWT must purchase an agreed $ volume from Amiad on an annual basis; if AWT

does not do so, Amiad may elect to continue or discontinue the exclusive nature
of the distribution agreement. The annual increase in sales/quota should be a
reasonable number and will be jointly agreed between Amiad and AWT. If AWT
meets the quota, it has an automatic right of renewal, subject to continued
creditworthiness, continuing and responsible efforts to sell Amiad filtration, and
responsible maintenance of equipment it has sold.

(*Id.*)  The Contract set the sales quota as $55,000 for the January 1–December 31, 2005 year.

(*Id.*)  The Contract concluded with two final provisions as follows:

AWT is also permitted to sell Amiad filtration to customers outside of New York
City, on a project-by-project basis. Prior to engaging in each project, AWT must
obtain permission from Amiad.

It is the premise of this agreement that Amiad and AWT will cooperate on efforts
to sell Amiad filtration.

(*Id.*)

In April 2018, Amiad terminated the Contract based on AWT's alleged failure to pay an
overdue balance of approximately $18,000.  (Dkt. No. 1 ¶ 19.)  AWT's Complaint asserts that
Amiad's attempted termination was ineffective and a breach of the Contract because the Contract
gave AWT an automatic right of renewal subject to certain conditions.  (*Id.* ¶ 24.)  Those
conditions included that the sales quota be met but not that AWT be timely in its payment of
invoices.  (*Id.*)  AWT asserts that it met the sales quota that had been set in 2005 and which was
never altered, such that the agreement automatically renewed.  (*Id.* ¶¶ 14–18.)

In September 2018, Amiad moved to dismiss the Complaint pursuant to Fed. R. Civ. P.
12(b)(6) for failure to state a claim upon which relief could be granted.  (Dkt. No. 12.)  Amiad
argued that the two entities had never agreed to a sales quota for the 2017 year, such that AWT
could not claim that its right to serve as exclusive distributor was renewed for 2018.  (Dkt. No.
15 at 1–2.)  In September 2019, Judge Broderick—to whom the case was then assigned—denied
the motion to dismiss.  (Dkt. No. 25.)

2

In October 2019, Amiad filed an answer and counterclaims.  (Dkt. No. 28.)  The counterclaims asserted claims arising from unpaid invoices that AWT allegedly owed and sought a declaratory judgment that Amiad properly terminated the Contract.  (*Id.* at 6–15.)  Three months later, Judge Broderick entered a Case Management Plan and Scheduling Order.  (Dkt. No. 34).

On March 13, 2020, Amiad filed a motion to amend the answer and assert new counterclaims, as well as a memorandum of law in support.  (Dkt. Nos. 36, 37.)  AWT filed a memorandum of law in opposition to that motion on March 25, 2020.  (Dkt. No. 39.)  On March 26, 2020, Amiad filed a motion to amend the March 13, 2020 motion, along with a revised proposed amended answer and counterclaims.  (Dkt. No. 40).  According to Amiad, an exhibit referenced in the March 13, 2020 submission was mistakenly omitted "while counsel's office was transitioning to remote working due to the Covid-19 crisis."  (Dkt. No. 50 at 7 n.3.)  AWT filed an opposition to Amiad's motion to amend the March 13, 2020 filing.  (Dkt. No. 52.)

AWT was unquestionably on notice of the inadvertently omitted exhibit—for several reasons.  First, the original motion to amend and proposed amended answer explicitly referenced it various times.  (*See, e.g.*, Dkt. No. 36–1 ¶ 17 ("Attached as Exhibit A is a true and correct copy of the publication."); Dkt. No. 37 at 8–9 ("Amiad's new counterclaim arises from facts based on documentary evidence, including . . . a publication by the president of AWT.")) Second, the Court credits Amiad's representation that "as soon as counsel for Amiad realized that the exhibit had not been filed, [Amiad's counsel] sent an email to Plaintiff's counsel notifying him of the mistake, telling him that we were planning to refile the motion with the exhibit, and offering to email him a copy of the exhibit. While Plaintiff's counsel complained, he did not ask for an opportunity to refile his Opposition to advance a new argument."  (Dkt. No. 53.)  Third, the

3

Court notes that AWT's own president is the author of the exhibit, so AWT cannot claim surprise regarding its existence.  (Dkt. No. 40, Ex. A.)  For those reasons, Amiad's motion to amend the March 13, 2020 filing (Dkt. No. 36) is granted.  The Court deems Dkt. No. 40 (hereinafter, the "Motion") to be the live pleading and will consider Amiad's March 13, 2020 memorandum of law (Dkt. No. 37) in support of it.  Amiad filed its reply memorandum of law on April 8, 2020.  (Dkt. No. 50.)

The proposed counterclaim alleges new wrongdoing by AWT.  In essence, Amiad asserts that AWT breached principles of good faith and fair dealing and the Contract's requirement for AWT to engage in "continuing and reasonable efforts to sell Amiad filtration" by "denigrating Amiad products to existing and potential customers," by promoting its own competing product line (called "Omicron"), and by engaging in a variety of other conduct designed to deprive Amiad of the benefits of its bargain.  (Dkt. No. 40–1 ¶¶ 65–72.)  The proposed amended answer and counterclaims states that AWT "refused to agree with Amiad on the sales quota . . . in order to strangle the sale of Amiad products and that AWT was required to "refrain from engaging in conduct that would deprive Amiad of the benefits of the [Contract]."  (*Id.* ¶¶ 69–70.)

Amiad's opposition insists that AWT's proposed amendment would be futile because no monetary damages can be recovered from the counterclaim.  (Dkt. No. 39 at 5–7.)  Amiad also argues that the Contract did not prohibit AWT from selling competing products within its exclusive-distribution territory (the "Territory").  (*Id.* at 7–8.)  Finally, Amiad accuses AWT of making an unjustified, bad-faith attempt to delay the prosecution of Amiad's meritorious claims. (*Id.* at 9–10.)

### APPLICABLE LAW

Under Federal Rule of Civil Procedure 15(a)(2), "[t]he court should freely give leave [to

4

amend a pleading] when justice so requires." *See also Foman v. Davis*, 371 U.S. 178 (1962);

*Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) ("When a party requests leave

to amend his complaint, permission generally should be freely granted."). "However, it is well

established that leave to amend a complaint need not be granted when amendment would be

futile." *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003). "Proposed amendments are futile if

they 'would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal

Rules of Civil Procedure.'" *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v.*

*Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015) (quoting *Panther Partners*

*Inc. v. Ikanos Commc'ns, Inc*., 681 F.3d 114, 119 (2d Cir. 2012)). "Thus, the standard for

denying leave to amend based on futility is the same as the standard for granting a motion to

dismiss." *Id.* "When considering a motion to dismiss pursuant to Rule 12(b)(6), the district

court . . . is required to accept as true the facts alleged in the complaint, consider those facts in

the light most favorable to the plaintiff, and determine whether the complaint sets forth a

plausible basis for relief." *Galper v. JP Morgan Chase Bank, N.A*., 802 F.3d 437, 443 (2d Cir.

2015).

## DISCUSSION

The Motion seeks to add a "Second Counterclaim" titled "Breach of Contract and of

Good Faith and Fair Dealing Under the 2005 Agreement." (Dkt. No. 40–1 at 14.) "Under New

York law, parties to an express contract are bound by an implied duty of good faith, but breach

of that duty is merely a breach of the underlying contract." *Cruz v. FXDirectDealer*, LLC, 720

F.3d 115, 125 (2d Cir. 2013) (quoting *Harris v. Provident Life & Accident Ins. Co*., 310 F.3d 73,

80 (2d Cir. 2002)). "New York law . . . does not recognize a separate cause of action for breach

of the implied covenant of good faith and fair dealing when a breach of contract claim, based

upon the same facts, is also pled." *Id.* (quoting *Harris*, 310 F.3d at 81). Nevertheless, the Second Circuit has recognized "two paths to establish a breach of contract claim" under New York law: "breach of the express terms or breach of '[i]mplied contractual obligations.'" *Giller v. Oracle USA, Inc.*, 512 F. App'x 71, 73 (2d Cir. 2013) (quoting *Wakefield v. N. Telecom, Inc.*, 769 F.2d 109, 112 (2d Cir. 1985)). "Under New York law, the elements of a breach of contract claim are (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages." *Swan Media Grp., Inc. v. Staub*, 841 F. Supp. 2d 804, 807 (S.D.N.Y. 2012).

As described above, Amiad bases its theory of liability on the following conduct by AWT: "denigrating Amiad's products to existing and potential customers in the Territory"; "undertaking to develop, promote, and market a competing line of products that it would offer to existing and potential Amiad customers"; "refus[ing] to agree with Amiad on the sales quota . . . in order to strangle the sale of Amiad products"; "undermining Amiad products' position and reputation in the market"; and "insisting that Amiad could not terminate the [Contract] and use another distributor who would actually strive to sell its products in the Territory." (Dkt. No. 40–1 at ¶¶ 68–69.) At issue is whether that conduct violates any express or implied provision of the Contract.

Amiad argues that AWT's conduct breached its express contractual promise to engage in "continuing and responsible efforts to sell Amiad filtration." (*Id.* at ¶¶ 65, 69.) "Where the contract is unambiguous, courts must effectuate its plain language." *Seabury Const. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 68 (2d Cir. 2002) (citing *Slamow v. Del Col*, 594 N.E.2d 918, 919 (1992) (stating that "[t]he best evidence of what parties to a written agreement intend is what they say in their writing")).

6

The plain language of the Contract does not create a freestanding obligation for AWT to engage in "continuing and responsible efforts to sell Amiad filtration." Rather, the entirety of the second paragraph of the Contract relates to AWT's rights to automatic renewal of the agreement and does not impose any obligations on AWT. It states that "[r]enewal of th[e] agreement will be automatic on an annual basis *subject to*" a number of conditions including AWT's satisfaction of the quota, its "continued creditworthiness," its "responsible maintenance of equipment it has sold," and "continuing and responsible efforts to sell Amiad filtration." (Dkt. No. 1–1 (emphasis added).) Amiad's argument cannot be reconciled with the plain language of the agreement, read either in isolation or as a whole. By the argument's logic, all conditions under the right-of-renewal section are freestanding contractual obligations, such that AWT would be in breach of the Contract if—for example—it failed to purchase the agreed-upon product volume or if it failed to maintain creditworthiness. The plain text of the Contract compels an interpretation that they are not. Indeed, the proposed answer implicitly acknowledges as much by asserting that "AWT did not meet *the criteria set forth for automatic renewal* when it failed to engage in continuing and responsible efforts to sell Amiad filtration.'" (Dkt. No. 40–1 ¶ 37.)

The "continuing and responsible efforts" provision was a condition precedent to automatic renewal, not an independent duty that subjected AWT to liability for damages in the event of noncompliance. *See Ginett v. Computer Task Grp., Inc*., 962 F.2d 1085, 1099 (2d Cir. 1992) ("A 'condition' is 'an event that must occur *before* performance of a contractual duty becomes due.'") (quoting II E. Allan Farnsworth, Contracts § 8.13 (1990)); *Preferred Mortg. Brokers, Inc. v. Byfield*, 723 N.Y.S.2d 230, 231 (2nd Dep't 2001) ("Express conditions precedent, which are those agreed to and imposed by the parties themselves, must be literally

performed.") (internal quotation marks and citation omitted); *Mullany v. Munchkin Enterprises, Ltd*., 893 N.Y.S.2d 714, 717 (3rd Dep't 2010) ("Whether a condition precedent exists under the terms of a contract is a matter of law for the court to decide.") (internal quotation marks and citation omitted).  The proposed counterclaim cannot survive to the extent that it relies on a breach of that contractual provision.

The question remains whether Amiad has stated a viable claim for breach of contract based on any other express or implied contractual obligations.[1]  All parties agree that this letter agreement is wanting for clarity and detail.  The Court concludes that it would also be wanting for basic consideration unless an implied condition could fill the gap.  *See Register.com, Inc. v. Verio, Inc*., 356 F.3d 393, 427 (2d Cir. 2004) ("To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound.") (citation omitted).  As first-year law students learn, "consideration" is "a performance or return promise" that is "bargained for . . . in exchange for [the other party's] promise[.]"  Restatement (Second) of Contracts § 71 (1981); *see also Roberts v. Weight Watchers Int'l, Inc*., 217 F. Supp. 3d 742, 752 (S.D.N.Y. 2016), *aff'd*, 712 F. App'x 57 (2d Cir. 2017) ("A bilateral contract may be illusory for lack of mutuality of obligation.").

---

[1] The Court takes a brief moment to address AWT's argument regarding remedies.  AWT argues that, even if Amiad's allegations are taken as true, the only remedy available to Amiad would be termination of the contract because that "there is no provision in the Contract . . . for [Amiad] to recover 'monetary damages' if plaintiff failed to meet the stated conditions."  (Dkt. No. 39 at 6.)  In opposition, Amiad responds that "it is a basic precept of contract law that where a party breaches its express obligation to perform or its implied duty of good faith and fair dealing . . . it will be liable for the damage it causes that party."  (Dkt. No. 50 at 4.)  Amiad is plainly correct. AWT's position—that a contract must contain an express "provision" allowing a party "to recover 'monetary damages'" in order for the victim of a breach to be compensated—defies introductory-level contract doctrine and finds no support in the caselaw or the New York statutory regime.  (Dkt. No. 39 at 6.)  *See, e.g., APL Co. PTE v. Blue Water Shipping U.S. Inc*., 592 F.3d 108, 111 (2d Cir. 2010) ("It is elementary that a party injured by a breach is entitled to recover damages that are the 'natural and probable consequence of the breach.'") (quoting *Bi–Econ. Mkt., Inc. v. Harleysville Ins. Co. of N.Y*., 886 N.E.2d 127, 130 (2008)); *Terminal Cent. Inc. v. Henry Modell & Co.*, 212 A.D.2d 213 (1st Dep't 1995) ("Limitations on a party's liability will not be implied and to be enforceable must be clearly, explicitly and unambiguously expressed in a contract."); N.Y. U.C.C. § 2-719(b) ("[R]esort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.")

To explain the consideration issue here, it is worth reiterating the Contract's structure. The Contract begins, in Paragraph 1, with Amiad's grant of an exclusive distributorship right to AWT. (Dkt. No. 1–1 ("Amiad assigns distribution of its . . . filtration products exclusively to AWT for wholesale and retail sales within the territory and markets defined below[.]").) By the end of Paragraph 1, AWT has received a benefit (exclusive distributorship) but has not yet undertaken any return obligation. Paragraph 2 starts: "Renewal of this agreement will be automatic on an annual basis subject to the following[.]" (*Id.*) As discussed above, that paragraph then sets forth various conditions precedent to automatic *renewal* of the agreement (on an annual basis). By the end of Paragraph 2, AWT has still not assumed any duty in exchange for its exclusive distributorship right. The penultimate section of the Contract states that "AWT is also permitted to sell Amiad filtration to customers outside of New York City on a project-by-project basis" with "permission from Amiad." (*Id.*) That is another benefit for AWT; it does not reflect a bargained-for return promise in exchange for the exclusive distributorship right.

The final section of the Contract reads: "It is the premise of this agreement that Amiad and AWT will cooperate on efforts to sell Amiad filtration." (*Id.*) There, for the first time, the Contract might possibly be read to impose some obligation on AWT: an obligation to "cooperate on efforts to sell Amiad filtration." But it is questionable whether that hortatory aspiration counts as a true return promise. Courts have held that writings "characterized by precatory language, such as, 'It is the intention of [the parties]' and 'The goal is' . . . [are] unenforceable." *Dragon Head LLC v. Elkman*, 987 N.Y.S.2d 60, 61 (1st Dep't 2014) (determining that a writing was unenforceable based on similar language and based on the fact that a "number of agreements" that the writing contemplated had "yet to be negotiated"); *Rosenbaum v. Atlas & Design Contractors, Inc*., 887 N.Y.S.2d 93, 95 (1st Dep't. 2009) ("[T]he proposed time frame set

forth was precatory and thus did not . . . support an action for breach.") (internal quotation marks omitted); *Triple M. Roofing Corp. v. Greater Jericho Corp.*, 349 N.Y.S.2d 771, 773 (2d Dep't 1973) (distinguishing "precatory" from "mandatory" language); *cf.* 17A C.J.S., *Contracts*, § 421 (Apr. 2020). ("Precatory words in a contract will be given mandatory effect only when it appears from all the facts and circumstances that the party using them intended that they should impose a mandatory obligation.").

In the absence of consideration from AWT, the contract would be rendered illusory and unenforceable, a result that "is disfavored" under New York law. *Credit Suisse First Bos. v. Utrecht-Am. Fin. Co.*, 915 N.Y.S.2d 531, 535 (1st Dep't 2011).

Over a century ago, Judge Cardozo confronted a similar problem in his celebrated opinion of *Wood v. Lucy, Lady Duff-Gordon*, 118 N.E. 214 (1917). In *Wood*, "[t]he defendant gave an exclusive privilege [to the plaintiff]. She was to have no right for at least a year to place her own indorsements or market her own designs except through the agency of the plaintiff." *Id.* The plaintiff, for his part, merely "accept[ed] the exclusive agency" and agreed to give the defendant half of the profits he commanded. *Id.* "Unless he gave his efforts, she could never get anything." *Id.* Judge Cardozo refused to "suppose that one party was to be placed at the mercy of the other" and therefore determined that "a promise" to "use reasonable efforts to place the defendant's indorsements and market her designs" was "fairly to be implied." *Id.* (explaining that "[t]he law ha[d] outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal"). "A promise may be lacking, and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed," Judge Cardozo explained. *Id.* (quoting *McCall Co. v. Wright*, 117 N. Y. Supp. 775 (1909)).

"[A]s first articulated in [*Wood*], and confirmed by that case's progeny, New York law

may imply into an agreement an obligation that a licensee must use reasonable efforts to exploit the licensed products[.]" *Automated Irrigation Controls, LLC v. Watt Stopper, Inc*., 407 F. Supp. 3d 274, 288 (S.D.N.Y. 2019).  In other words, "[i]t is settled law that the court will imply a duty on the part of an exclusive licensee to exploit the subject matter of the license with due diligence, where such a covenant is essential as a matter of equity to give meaning and effect to the contract as a whole." *Vacuum Concrete Corp. of Am. v. Am. Mach. & Foundry Co*., 321 F. Supp. 771, 772 (S.D.N.Y. 1971) (Mansfield, J.).  "The reasoning of these decisions is that it would be unfair to place the productiveness of the licensed property solely within the control of the licensee, thereby putting the licensor at his mercy, without imposing an obligation to exploit upon the licensee." *Id.* at 773.  "In effect the court is merely enforcing an obligation which the parties overlooked expressing in their contract or which they considered unnecessary to be expressed." *Id.*

The Contract suffers from the exact infirmity that *Wood* and its progeny were designed to cure.  Without an implied efforts condition, the Contract gives AWT a stranglehold on Amiad; AWT owns the exclusive right to distribute Amiad's products but has no obligation to sell even a single one.  *See* Oral Arg. Tr. at 20–21 (AWT concession that if AWT had "decided" that it was "not going to sell . . . a dollar's worth" and would instead "lock [Amiad] up to the exclusivity," Amiad's only recourse would have been that the "contract would not be renewed for the following fiscal year" because Amiad would "not . . . have had a right to sue [AWT] for the difference between the quota that was stated and what [AWT] actually sold").  Indeed, while the Contract specifies that "[r]enewal of [the] agreement" occurs annually as long as, among other events, "AWT . . . purchase[s] an agreed $ volume from Amiad," AWT *need* not purchase that "agreed $ volume" in any given year—it could buy nothing and simply sacrifice its right to

11

renewal, all while in perfect compliance with that provision.  (Dkt. No. 1–1.)  The caselaw does not tolerate "that one party [will] be placed at the mercy of the other," even for just one year. *Wood*, 118 N.E. 214.

Nor does the statutory regime in New York.  Many years after *Wood*, the New York Uniform Commercial Code ("U.C.C.") codified its holding in the context of contracts for the sale of goods.  *See MDC Corp. v. John H. Harland Co*., 228 F. Supp. 2d 387, 394 n.3 (S.D.N.Y. 2002) ("It is widely recognized that section 2–306(2) of the U.C.C. codified the New York Court of Appeals's holding in *Wood*."); 2–6 Corbin on Contract § 6.5 (calling *Wood* "clearly the ancestor of U.C.C. § 2–306").  "[U]nlike the *Wood* case itself," however, "which relied on a number of circumstances to support an inference of an implied promise, under the UCC, an obligation is implied by the existence of an exclusivity term alone."  *Fakhoury Enterprises, Inc. v. J.T. Distributors*, 1997 WL 291961, at *3 (S.D.N.Y. June 2, 1997).  Specifically, under the U.C.C., "[a] lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale."  N.Y. U.C.C. § 2–306(2).  Amiad is correct that the N.Y. U.C.C. is background law that the Court is required to apply regardless of whether it is specifically referenced in the proposed amended counterclaim—which it is not.

Section 2–306(2) offers an escape hatch from the implied best-efforts position where parties are "otherwise agreed."  The Contract reflects no such agreement.  To the contrary, as explained above, "[u]nless [AWT] gave [its] efforts, [Amiad] could never get anything," *Wood*, 118 N.E. 214, and might well be unenforceable for lack of consideration.  This is a textbook case for application of Section 2–306(2) and the *Wood* solution.

Still, the New York courts are somewhat divided as to the precise meaning and application of a "best efforts" obligation. One issue is whether a party necessarily breaches that obligation by dealing in a competitor's goods. In *Martin Pincus Mktg. v. Sawyer of Napa, Inc.*, the court analyzed a contract with such an "implicit" obligation to "employ . . . best efforts" and concluded that the obligation "preclude[d] any possibility for the sale of goods competing with the [manufacturer's] line." 774 F. Supp. 171, 174 (S.D.N.Y. 1991). But most courts have not taken such a hard line. *See New Paradigm Software Corp. v. New Era of Networks, Inc*., 2002 WL 31749396, at *15 (S.D.N.Y. Dec. 9, 2002) ("[T]here is no breach of contract per se from marketing [a competitor's product.]"); *Joyce Beverages of New York, Inc. v. Royal Crown Cola Co*., 555 F. Supp. 271, 275, 277 (S.D.N.Y. 1983) (holding that "[a] best efforts clause is not *per se* breached by a mere undertaking of a competitive product line" but concluding that a "second distributorship" agreement was, in that case, "factually and legally inconsistent with the 'best efforts' obligation").

"'Best efforts' is a term which necessarily takes its meaning from the circumstances." *Bloor v. Falstaff Brewing Corp*., 454 F. Supp. 258, 266 (S.D.N.Y. 1978), *aff'd*, 601 F.2d 609 (2d Cir. 1979) (internal quotation marks and citation omitted). As noted above, "the New York law is far from clear" on what standard is imposed by a best-efforts provision. *Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 613 n.7 (2d Cir. 1979) (Friendly, J.). The Second Circuit has said that "it is unfortunate that a federal court must have to apply it." *Id.*; *see also McDonald's Corp. v. Hinksman*, 1999 WL 441468, at *12 (E.D.N.Y. May 28, 1999) ("The standard applied under New York law to establish whether a party has fulfilled its obligations under a 'best efforts' clause is murky.")

In *Bloor*, Judge Friendly listed various possible standards. 601 F.2d at 613 n.7. Some

13

cases, he observed, "suggest that under New York law a 'best efforts' clause imposes an obligation to act with good faith in light of one's own capabilities." *Id.* (citing *Van Valkenburgh v. Hayden Publishing Co*., 281 N.E.2d 142 (1972)). Others suggest that a party must perform "as well as 'the average prudent comparable' [businessperson]." *Id.* (quoting *Arnold Productions, Inc. v. Favorite Films Corp*., 176 F.Supp. 862, 866 (S.D.N.Y.1959), *aff'd* 298 F.2d 540 (2d Cir. 1962). Comment 5 to U.C.C. § 2–306 states that, under a best-efforts obligation, an:

> exclusive agent is required . . . to use reasonable effort and due diligence in the expansion of the market or the promotion of the product, as the case may be . . . [and that an] exclusive dealing agreement brings into play all of the good faith aspects of the output and requirement problems of subsection (1).[2]

The Court agrees that merely selling competing products does not, necessarily, in every case, mean that a party has breached a best-efforts obligation. But it need not decide today what the "best efforts" obligation in the circumstance of the Contract required. The facts alleged in Amiad's proposed counterclaim suggest that there are circumstances where AWT's conduct would result in a breach of contract. According to the proposed amended answer, "AWT . . . revealed its scheme when [AWT's president] admitted [in a] publication that rather than actively sell Amiad products, it had been able to successfully suppress sales of Amiad products and 'inside less than three years Omicron . . . ha[d] almost completely replaced Amiad as the choice of New York's community of engineers and owners.'" (Dkt. No. 40 ¶ 18 (quoting *id.*, Ex. A.)) It is plausible that intentionally suppressing the sale of products, and replacing those products with competing products, while taking advantage of an exclusivity provision, would violate even a forgivingly-defined "best efforts" obligation. The Court need go no further to grant Amiad's

---

[2] Section (1) states: "A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded."

motion.  Amiad's breach-of-contract counterclaim is therefore not futile and will be permitted.[3]

## CONCLUSION

For the foregoing reasons, the motion to amend is GRANTED.  The Clerk of Court is respectfully directed to close Dkt. Nos. 36 and 40.

SO ORDERED.

Dated: April 29, 2020
       New York, New York
                                                    _____
                                                        LEWIS J. LIMAN
                                                    United States District Judge

---

[3] AWT's suggestion that the proposed amendment "is made in bad faith and solely for the purposes of delaying the prosecution of plaintiff's meritorious claims" is rejected.  (Dkt. No. 39 at 9.)  Amiad has explained that the facts supporting the proposed counterclaim were "found while Amiad was gathering documentation to facilitate settlement discussions and document disclosure."  (Dkt. No. 37 at 2.)  The parties have just begun discovery; no depositions have been taken.  (*Id.* at 9.)  AWT will not be unduly prejudiced by the addition of this counterclaim.